

# NUMBER 13-18-00396-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**DOMINGO VILLARREAL,**        **Appellant,**

**v.**

**THE STATE OF TEXAS,**        **Appellee.**

---

### On appeal from the 148th District Court
### of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Hinojosa, Perkes, and Tijerina**
**Memorandum Opinion by Justice Perkes**

Appellant Domingo Villarreal was convicted of manslaughter with a deadly weapon, a second-degree felony, and sentenced to twenty years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.04. By what we construe as three issues, Villarreal argues (1) the prosecutor engaged in prosecutorial misconduct, and he was "denied a fair trial when the

prosecutor became a necessary trial witness on a contested issue whom Villarreal was prevented from cross-examining in violation of his 14th and 6th Amendment rights and Texas Constitution Art. I, §10"; (2) the trial court erred in failing to *sua sponte* declare a mistrial following the prosecutor's misconduct; and (3) the evidence was legally insufficient to support a conviction. We affirm.

## I.     BACKGROUND

On March 15, 2017, Villarreal was indicted for "capital murder by terror threat/other felony." *See id.* § 19.03(a)(2). Villarreal, along with Ian Hernandez, Juan Herrera, Andrew Luis, and Joe DeLuna, were implicated in the murder and attempted robbery of seventy-year-old Jesus Cruz. Villarreal pleaded not guilty and the case proceeded to trial, where several witnesses, including Luis, testified.

### A.     Officer Allen Miller

Corpus Christi Police Department (CCPD) Senior Officer Allen Miller testified he was dispatched to a residence in the 1400 hundred block of El Paso Drive over reports of a shooting on December 18, 2016, at approximately 11:26 p.m. Miller stated he arrived within "minutes of the call going out." According to Miller, as he was pulling into the driveway, "We had people running at us saying, 'They shot. They shot him, they shot him. They shot grandpa.'" Once inside the home, Miller testified he attempted "basic life-saving, combat life-saving medical aid" on an elderly male later identified as Jesus until emergency personnel arrived. Jesus succumbed to his injuries at the hospital.

### B.     Severo Cruz

Jesus's son, Severo Cruz, testified that four masked men broke into his home that evening, and he believed he knew the identities of two of the men: Villarreal, his daughter's ex-boyfriend, and Hernandez, Villarreal's friend.

2

Severo said he had just gotten out of the shower when he "heard the [front] door get kicked open." He ran out to the hallway to find his mother, wife, and their three children being ordered to "get the F down on the ground." Severo testified he and Jesus ran to Jesus's room, where he tried to "help [his] dad to get out of the window." "[I heard] the gunshots by the hallway, two gunshots, and then I heard my dad just take a deep breath and just go down," said Severo. The two bullets penetrated the closed bedroom door and struck Jesus, who he said was beside him at the time.

When asked how he knew who was responsible for his father's death, Severo maintained he recognized one of the voices as belonging to Villarreal and identified Villarreal in the courtroom. Severo also insisted he heard Hernandez say "'[s]hoot the bitch open.'" On cross-examination, Severo was confronted with his 9-1-1 call, wherein he was asked by dispatch if he knew who the perpetrators were, and Severo said he did not.

Severo also testified to events occurring earlier that same evening. Severo stated he had come out of his bedroom to find Villarreal in the living room, arguing with his daughter, Miranda Cruz. Severo testified Villarreal "started just telling [him] stuff," kicked the family's dog, "then from there he got the Christmas tree and threw it against the wall, and he said, 'I'll be back.'" Severo called the police to report the incident.[1]

## C.    Miranda Cruz

Miranda, Severo's 18-year-old daughter and Villarreal's ex-girlfriend, also testified. Miranda, like Severo, identified two of the masked men as Hernandez and Villarreal. After

---

[1] CCPD officer Joel Torres confirmed that he received a dispatch call regarding a disturbance at the Cruz household at approximately 10:00 p.m. that evening. Torres testified he was told by Severo that Villarreal had "come by" and "knocked his Christmas tree over and kicked his dog."

Villarreal was arrested, Miranda said he called her from jail to apologize. "I remember he told me he was sorry," testified Miranda. Jail call recordings were admitted into evidence,[2] and Villarreal can be heard telling Miranda: "Dude, I'm sorry, dude. I love you so much. I'm sorry, Miranda. It was never supposed to be like this. I'm sorry. I just—I hope you take care of yourself. Stay out of trouble. Be good for me, please. I wanted to hear your voice. I'm sorry for everything, Miranda."

Miranda acknowledged on cross-examination that Villarreal could have been referring to what had transpired earlier in the evening. On direct-examination, however, Miranda provided conflicting testimony as to why Villarreal had been at her home previous to the incident and what prompted him to leave. Miranda first stated, "What happened was he said that my dad burned his—[Villarreal's] aunt." Miranda then testified that Villarreal was upset with her because he wanted her to go over to his home, but she did not want to go. Miranda stated Villarreal then kicked the family's Christmas tree and dog before leaving. She testified, "He said he was coming back, he told my dad, he said, 'SOS. You have a green light.'" Miranda explained that "SOS" meant "shoot on sight." Miranda then stated they parted ways soon after but not because she wanted him to leave. "I was mad because he wasn't staying."

### D.    Andrew Cruz

Andrew Cruz[3], Miranda's nineteen-year-old brother, testified that after the four armed men entered the home, they demanded everyone drop to the floor. Andrew said

---

[2] In a separate call, Villarreal told another individual, "I f-cked up, bro. I just needed to hear a friend, bro. . . . I f-cking f-cked up bad, bro." Villarreal did not elaborate.

[3] In exchange for testifying, Andrew was offered ten years' deferred adjudication on two robbery cases and "maybe a robbery . . . and maybe a burglary of a habitation," for which he had not yet been indicted on.

he was "pistol whipped"[4] and threatened. "They were threatening us[,] saying, 'Are you ready to die,'" said Andrew. Although he named Hernandez and Villarreal as two of the individuals who had broken into the home based on voice recognition, Andrew admitted on cross-examination that he had never met Hernandez before and did not know what his voice sounded like. Andrew said it was Miranda who told him she knew it was Hernandez.[5]

**E.    Andrew Luis**

Luis, twenty-three years old at the time of trial and an accomplice in the shooting, denied he used drugs or was involved in any criminal activity prior to the December 18, 2016 incident. In exchange for testifying, Luis accepted a plea bargain deal for ten years' deferred adjudication.

Luis testified that on the evening of December 18th, he received a phone call from Herrera asking him if he wanted to help Herrera "hit a lick." Luis explained that term was slang for getting marihuana by use of force. Luis then drove his 2011 Nissan Juke to Herrera's mother's house. Luis said Herrera got in the car and described the "plan." While they were still parked outside Herrera's residence, Luis said Herrera called Villarreal and Hernandez. Herrera then went back into his house and returned several minutes later with his infant child[6] and cousin, Joe DeLuna. Once "the cousin got involved," Luis said

---

[4] Photographs of Andrew taken by law enforcement at the home and admitted at trial depict a fresh head wound, substantiating his claim that he was hit in the head with a gun.

[5] While Andrew also testified to Villarreal being at his family's home hours before the shooting, Andrew's recollection of the details surrounding the confrontation included facts not stated by any other witnesses. Andrew testified that Villarreal, in addition to kicking their dog, also "shot the dog"—a detail unmentioned by Andrew before trial.

[6] Luis did not know the child's age but surmised that the child was still an infant because the child could not walk yet. Luis testified he initially verbalized taking issue with the child being brought along, but Herrera dismissed his concerns.

he became concerned "because [DeLuna] had just got out of prison." Luis testified he "wanted" to say he was "done," but he was "scared of both of them."

Luis said he was first instructed to drive to Villarreal's mother's home to pick up Villarreal and Hernandez. Luis testified he was then given directions to Cruz's home. Once there, Villarreal, Hernandez, Herrera, and DeLuna "got out and [Herrera] told me to drive around the block," detailed Luis, who, after following Herrera's orders, remained inside the car with the baby. Though Luis could not recall ever hearing gun shots, he testified he remembered seeing DeLuna and Hernandez running back to the vehicle carrying guns. "All I hear—I don't know who says what, but all I heard is 'Who shot? Who shot?'", and someone in the backseat responded, "'I did.'" Luis said Villarreal, Hernandez, and DeLuna were in the backseat, and he believed it was DeLuna who had accepted responsibility. Luis testified that Herrera and DeLuna threatened everyone to keep quiet "or else."

When he dropped off DeLuna, Luis said he noticed DeLuna had taken the guns with him. Luis, Villarreal, Hernandez, and Herrera then went to Whataburger, and a receipt with a timestamp of 12:25 a.m., about an hour after the shooting, was admitted into evidence. Luis testified he was on his way to Herrera's home, having just dropped off Villarreal and Hernandez, when he was pulled over by police.[7]

Luis denied ever going into the Cruz's home or touching a weapon. On cross-examination, Luis was unable to answer why he had more gunshot primer residue particles on his hands than the other men involved.

---

[7] CCPD retrieved surveillance footage from a neighboring house showing a vehicle leaving the area at the time of the shooting that matched the vehicle driven by Luis and the description provided by Cruz's family.

## F.    Roger Bernal

Roger Bernal testified that Villarreal confided in him while the two were in custody at the Nueces County Jail.[8] Bernal said Villarreal told him "he had got into it" with his girlfriend's parents. "That he had somebody to go over there to rough up, what was it, her father," testified Bernal. On cross-examination, Bernal clarified that he was never told by Villarreal that he, himself, had gone to "rough up" Miranda's father. "I don't know the person's name, just that he had sent somebody to go rough up her father," testified Bernal.

Bernal's relationship with the prosecution was also briefly at issue at trial. According to Bernal, at some undisclosed point after Bernal was no longer in custody and had provided his statement to the police to report what Villarreal purportedly disclosed to him, the prosecutor had paid Bernal $20 to help him "move some furniture" out of a garage.

## G.    Physical Evidence

Within hours of the shooting four of the five men were arrested, and their hands and arms were swabbed for gunshot residue (GSR). Christopher Chany, a GSR analyst with Texas Department of Public Safety Crime Laboratory in Austin, testified he found "characteristic gunshot primer residue particles"[9] on all four men.

---

[8] Bernal was being held for a warrant on an outstanding motion for revocation on a possession of controlled substance case. Bernal testified that he had previously served prison sentences for both federal and state-controlled substance-related offenses.

[9] Chany explained that

when a gun is fired, there's the cartridge case[, which] has two components in it. Towards the back in the primer cup is the primer, and then there's the gun powder that fills up most of the cartridge. When that hammer hits the primer cup, it causes a small explosion to occur in that primer cup. . . . What I am looking for in this test are components of the primer that are in that primer cup. . . .

7

For Mr. Villarreal[,] [there] was one characteristic gunshot primer residue particle was found on his kit. For Mr. Hernandez[,] one characteristic particle was found on his kit. For Mr. Luis[,] four characteristic gunshot residue particles were confirmed on his kit. And for Mr. Herrera[,] two characteristic gunshot residue particles were confirmed on his kit.

According to Chany, DPS generally will not analyze "hand stubs" that were retrieved more than "four hours from an incident" because of how easy GSR "wears off." Chany opined that the transference of GSR between persons and objects is just as easy; therefore, having less GSR particles does not mean that an individual did not handle a weapon anymore that having more GSR particles means an individual did handle a weapon. Both are just indicators of possible proximity to a recently fired weapon.

CCPD also recovered two bullet casings from the home. Carolyn Martinez, a firearm and tool mark examiner with CCPD, testified that she was unable to identify the specific firearm used because the bullet casings recovered lacked sufficient detail markings, and the weapon used for this offense was never located.

On December 20, 2016, Dr. Ray Fernandez, Medical Examiner for Nueces County, performed an autopsy on Jesus. Dr. Fernandez confirmed that Jesus sustained two gunshot wounds: one to the "right upper back" that did not exit the body and "a perforating gunshot wound at the right lower back." According to Dr. Fernandez, the bullet that entered the right lower back "went through the lung on one side, then went through the spinal column, went through the lung on the other side, and then came out on the other side." Dr. Fernandez opined that no other notable medical conditions could have contributed to Jesus's death.[10]

---

[10] Jesus was also negative for drugs, but there was "a small amount of alcohol" in his system of "maybe half, less than half" of a beer, said Dr. Fernandez.

A video recording of Villarreal being transported to the jail was also admitted into evidence, wherein Villarreal claimed he acted in "self-defense" that evening and made several incriminating statements.

The jury returned a guilty verdict. This appeal followed.

## II.   PROSECUTORIAL MISCONDUCT

By his first issue, Villarreal argues that the prosecutor in this case deprived him of a fair trial by engaging in prosecutorial misconduct when he improperly questioned a witness with whom he had an existing relationship. The State counters that because Villarreal raised no objection at trial and "never even attempted to call the prosecutor as a witness, ask that he be disqualified from continuing as the prosecutor so that he could be called, or for any other relief short of a mistrial, including possibly striking Bernal's testimony," he has waived error. *See* TEX. R. APP. P. 33.1.

"Prosecutorial misconduct rises to a due-process violation when it is so significant that it deprives a defendant of a fair trial." *Clark v. State*, 365 S.W.3d 333, 338 (Tex. Crim. App. 2012) (citing *Greer v. Miller,* 483 U.S. 756, 765 (1987)); *see also* TEX. CODE CRIM. PROC. ANN. art. 2.03 ("It is the duty of . . . the attorney representing the state . . . to so conduct themselves as to insure a fair trial for both the state and the defendant, not impair the presumption of innocence."). However, the allegation of prosecutorial misconduct must be urged at trial to preserve error on appeal. *Clark*, 365 S.W.3d at 339; *see Castruita v. State*, 584 S.W.3d 88, 112 (Tex. App.—El Paso 2018, pet. ref'd); *see also* TEX. R. APP. P. 33.1(a)(1)(A). The proper method of preserving error in cases of prosecutorial misconduct is to (1) object on specific grounds, (2) request an instruction that the factfinder disregard the comment, and (3) move for a mistrial. *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995); *Joyner v. State*, 548 S.W.3d 731, 735 (Tex. App.—

Houston [1st Dist.] 2018, pet. ref'd); *see also Tate v. State*, No. 13-09-00247-CR, 2011 WL 1938501, at *6–7 (Tex. App.—Corpus Christi–Edinburg May 12, 2011, no pet.) (mem. op., not designated for publication).

Our review of the record shows that Villarreal failed to object to either the prosecutor's questioning of Bernal or Bernal's testimony.[11] Therefore, Villarreal's complaints have not been preserved for review, and we decline to address them. *See* TEX. R. APP. P. 33.1; *Clark*, 365 S.W.3d at 339; *Penry*, 903 S.W.2d at 764; *Castruita*, 584 S.W.3d 88, 112. We overrule issue one.[12]

---

[11] The prosecutor briefly questioned Bernal at trial regarding their relationship:

Q.     Okay. Did I once hire you after the fact to help move some furniture or give you some furniture or gave you $20 to move some furniture out of the garage I was moving out of?

A.     Yes, sir.

Q.     And that was along with your girlfriend or your wife?

A.     My sister and my wife.

Q.     And all this was after you had told all this to the police, and you had been taken out of jail?

A.     Yes, sir.

Q.     Okay. Have we promised you anything else to come here to court?

A.     No, sir.

Q.     Okay. And why did you come here to court to say these things?

A.     Just because that's what he told me, to tell the truth.

On appeal, Villarreal also objects to the leading nature of this direct examination, arguing he should have been given an opportunity to cross-examine the prosecutor. Villarreal made no such objections or requests before the trial court, and following the State's direct examination, Villarreal was permitted to cross-examine Bernal on the nature of his relationship with the prosecutor.

[12] In one sentence of Villarreal's prosecutorial misconduct argument on appeal, he makes reference to an ineffective assistance claim, stating: "Defense counsel committed ineffective assistance of counsel by failing to request a mistrial." Villarreal provides no caselaw or analysis in support of an ineffective assistance claim. As such, to the extent Villarreal attempts to raise this issue, we conclude it has been inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

10

## II. SUA SPONTE MISTRIAL

Though Villarreal did not object to Bernal's testimony or the prosecutor's line of questioning, he asserts the trial court should have *sua sponte* declared a mistrial because the "conflicts of attorneys" created "some fundamental error or irregularity that prevent[ed] a proper judgment being rendered."

The traditional and preferred procedure for seeking a mistrial involves three steps: (1) objecting to a prejudicial event, if possible; (2) requesting an instruction that the jury disregard the prejudicial event; and (3) requesting a mistrial if the moving party believes that the instruction to disregard is insufficient. *See Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). A trial judge has the power to declare a mistrial *sua sponte* when "in [his or her] opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Torres v. State,* 614 S.W.2d 436, 442 (Tex. Crim. App. [Panel Op.] 1981) (citation omitted); *Hill v. State*, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002) ("Manifest necessity exists when the circumstances render it impossible to arrive at a fair verdict, when it is impossible to continue with trial, or when the verdict would be automatically reversed on appeal because of trial error."). The trial court should use this power with "the greatest caution under urgent circumstances, and for very plain and obvious causes." *Renico v. Lett*, 559 U.S. 766, 774 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)); *Torres*, 614 S.W.2d at 442; *see also Salinas v. State*, No. 13-18-00536-CR, 2019 WL 2847450, at *2 (Tex. App.—Corpus Christi–Edinburg July 3, 2019, no pet.) (mem. op., not designated for publication).

Here, a trial court could reasonably conclude that Bernal's "relationship" with the prosecutor, which was limited to completing a single menial task in exchange for $20.00,

11

had no substantive bearing on his testimony. Bernal reported Villarreal's supposed confession and was released from custody before any aforementioned "relationship" with the prosecutor began. Moreover, the substance of Bernal's testimony was largely inconsequential. Bernal did not place Villarreal at the scene of the crime, and Villarreal's tangential connection to Jesus's murder was established absent Bernal's testimony. Thus, these facts do not support a finding of manifest necessity by the trial court as to mandate a mistrial. *See Renico*, 559 U.S. at 774; *Torres*, 614 S.W.2d at 442. We overrule issue two.

### III.    SUFFICIENCY OF THE EVIDENCE

Villarreal next asserts that there was insufficient evidence to convict him of manslaughter.[13]

### A.    Standard of Review and Applicable Law

When reviewing claims of legal insufficiency, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Martinez v. State*, 527 S.W.3d 310, 320 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Zuniga*

---

[13] Villarreal does not appear to challenge the jury's deadly weapon finding; therefore, our analysis is limited to a manslaughter sufficiency of the evidence challenge, wherein Villarreal argues his identity as the shooter or party to the offense has not been proven.

*v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (citing *Hooper*, 214 S.W.3d at 13). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Id*.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In this case, a hypothetically correct charge would instruct the jury to find Villarreal guilty of the aforementioned offense if the State proved beyond a reasonable doubt that he "recklessly cause[d] the death of an individual." TEX. PENAL CODE ANN. § 19.04. A person "acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

A hypothetically correct jury charge would additionally instruct the jury that, under the law of parties, Villarreal is criminally responsible for an offense committed by another's conduct if, acting with intent to promote or assist the commission of the offense, he solicited, encouraged, directed, aided, or attempted to aid the other person to commit the offense. *Id.* § 7.02(a)(2). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions

13

showing an understanding and common design to do the prohibited act. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005).

**B.      Analysis**

Villarreal principally argues that he "should not be convicted based upon testimony that infers his guilt by stacking the testimony" of witnesses who were unable to definitively identify him as the shooter or participant in the shooting.

Several members of the Cruz family testified that Villarreal was at their home several hours prior to the shooting and engaged in a confrontational exchange with Miranda and her father Severo. *See Nisbett*, 552 S.W.3d at 265–66 ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt"); *see e.g.*, *Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018) (finding motive, a circumstance of guilt, where there defendant killed the complainant because he was angry with her for flirting with other men). Both Miranda and Severo claimed that Villarreal made threatening comments as he left, prompting Severo to report the incident to law enforcement, who also testified at trial.

While Miranda, Severo, and Andrew uniformly conceded that the four men who entered the home were masked, they each also unequivocally identified Villarreal's presence in the home, citing voice recognition. *See Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) ("[C]ombined with other incriminating evidence, a defendant's presence [during a crime] may be sufficient to sustain a conviction."); *Aviles-Barroso v. State*, 477 S.W.3d 363, 396 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) ("Voice identification of a defendant may constitute a sufficient basis for a conviction."); *see also Martin v. State*, 246 S.W.3d 246, 261 (Tex. App.—Houston [14th Dist.] 2007, no pet.)

14

(upholding murder conviction despite fact that defendant was "one of several other people who had the opportunity to injure" complainant).

Moreover, Luis, a co-accomplice, identified Villarreal as one of the four individuals who went into the home that evening and then fled; Luis, however, denied seeing Villarreal armed and identified another co-conspirator as the shooter. *See Gross*, 380 S.W.3d at 186; *but see Barrientos v. State*, 539 S.W.3d 482, 490 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Evidence is sufficient to convict under the law of parties "when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement."); *see, e.g.*, *Miller v. State*, 83 S.W.3d 308, 318 (Tex. App.—Austin 2002, pet. ref'd) (holding evidence sufficient to sustain murder conviction as party to offense when circumstances showed that appellant drove the shooter, assisted the shooter in obtaining the murder weapon, and attempted to flee with the shooter); *see also Booker v. State*, No. 13-16-00693-CR, 2017 WL 5184503, at *3 (Tex. App.—Corpus Christi–Edinburg Nov. 9, 2017, no pet.) (mem. op., not designated for publication) (concluding the appellant was a "party to the offense of manslaughter by promoting and assisting the commission of the offense").

Meanwhile, Bernal testified that Villarreal implicated himself in an altercation involving his ex-girlfriend's family, presumably speaking of Miranda and her family; although, that same individual denied that Villarreal admitted he was present at the time of the alleged altercation. *See Zuniga*, 551 S.W.3d at 732 (providing that it is within the providence of a jury to resolve conflicting testimony).

The State also presented evidence of GSR found on Villarreal four hours after the shooting indicating, at minimum, he was near a recently discharged weapon or person who had recently discharged a weapon. *See Ingerson*, 559 S.W.3d at 511 (finding GSR

15

may, along with other evidence, indicate culpability); *see also Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("Sufficient evidence can support a murder conviction even in the absence of physical evidence such as DNA evidence, fingerprinting evidence, and the murder weapon; thus, such evidence is not required to obtain a conviction.").

Finally, jail call recordings and a video recording of the evening Villarreal was arrested were admitted into evidence. In the former, Villarreal can be heard apologizing to Miranda and telling another individual that he had "f-cked up bad." *See Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015) ("When the burden of proof is 'beyond a reasonable doubt,' a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the corpus delicti." (quoting *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013))); *see also Pena v. State*, No. 13-17-00596-CR, 2019 WL 4200295, at *4 (Tex. App.—Corpus Christi–Edinburg Sept. 5, 2019, no pet.) (mem. op., not designated for publication) (finding the defendant's admissions that he had "f-cked up" and "put his hands on [the complainant]" were evidence to indicate guilt). In the latter recording, Villarreal admitted to the officer that he had been at the Cruz's residence; Villarreal said he had gone over to Miranda's house to take her back to his place because she had been fighting with her parents. *See Miller*, 457 S.W.3d at 924; *Gross*, 380 S.W.3d at 186. Villarreal claimed her family and her "took [sic] it out of proportion," and Villarreal stated he acted in "self-defense" after Jesus "c[ame] at [him] with a knife."

Based on the foregoing, and the applicable standard of review which allows a jury to draw any reasonable inference supported by the record, the jury could have found Villarreal recklessly caused Jesus's death. *See Alfaro-Jimenez*, 577 S.W.3d at 244;

*Zuniga*, 551 S.W.3d at 732; *Martinez*, 527 S.W.3d at 320. Accordingly, we find the evidence was sufficient to support Villarreal's conviction for manslaughter, and we resolve Villarreal's third issue against him.

### IV. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
20th day of August, 2020.